May it please the Court, I'm David Lawson of Aiken Gump Strauss Hauer & Feld for Appellant Michael Gallagher. This is my first opportunity to argue before you. I'm thrilled to be here and I want to thank the panel for taking the time to hear us today. Thank you and thank Aiken Gump on our behalf for agreeing to take the pro bono assignment. Thank you. We very much appreciate your firm and your willingness and the time. Thank you, Your Honor. Mindful of the Court's advice issued at the beginning of the session, here I'm going to try to avoid regurgitating everything that we set forth in the written briefs. With the Court's indulgence, though, I'd like to spend just three or four minutes before we turn to what may be the more interesting issues of the impact of the Obrey and Lazaruk cases on this appeal. Just to spend three or four minutes to talk about what this case, this appeal, and the case below is not about. What the case is not about is whether you think Michael Gallagher is a good guy, whether he's somebody you'd want to have home for dinner. Indeed, it's not about whether or not the arrest was lawful. It's not about whether it was okay for the police to beat him because he said some nasty things before they got there. That's simply not the issue here. The reason that I bring that up and lead off with that is it really struck me as I went over the transcripts and the briefs this morning for the 50th time, particularly the colloquy in which Judge Marshall, right before opening statements were given, denied the request by counsel to be allowed to go into the whole stabbing incident. It goes on for 10, 15 pages. Counsel was very explicit, asking Judge Marshall, May I say this? I want to go into this. I think this is relevant. Can I tell the jury that he threatened to stab these people? The court said no. Nevertheless, a few minutes later, counsel got up, did his opening statement, and he said precisely that. As you go on to take a look at both of the appellees' briefs, I think it's very striking that they're still arguing that this is relevant, that they're still referring to his criminal record. How much less relevant is it now than it was at trial? It seems that the tactic is to portray Mr. Gallagher as a bad person and to divert attention from the underlying merits of the case. And that brings me to OBRI, which is recently, as you know, an opinion issued by Judge Bybee. OBRI, of course, is very germane, as we indicated in our briefs, because it indicates that the burden of persuasion, of demonstrating that error is harmless, is on the party that benefits from the error, not the party that was, quote, the victim of the error. And, of course, OBRI, the opinion states that it is clarifying some confusing preexisting doctrine. It's not really creating new law, but just sort of reconciling. There had been some confusion in the law about how this harmless error test should be performed. We would argue, actually, Your Honor, that in light of OBRI, much of both of Apelli's briefs are kind of beside the point, because they're quite explicitly written in terms of Mr. Gallagher didn't meet his burden of showing that the jury would have come out in his favor. Well, without regard to whether or not you didn't have the guidance of OBRI at the time you briefed the case, can you give me your best argument? Because I did note that your brief did not contain any argument addressing the form of a curative instruction that Judge Marshall gave right after the offensive comment was made. What's your best case for arguing that that jury instruction was so insufficient that the district court abused its discretion in denying the motion for mistrial? Right. Well, Your Honor, one case that leaps out is the Guam case. The Guam case that we mentioned, that was the case in which there were allegations or evidence that was admitted regarding homosexual proclivities and so on and so forth. In that case, the court, right at the end of that opinion, indicated that no curative instruction would have been adequate. Again, I think that it's important, too, that this whole notion of the curative instruction can't be viewed in a vacuum. We have to look at the context of the specific case. The question, I think, to be asked is Well, if we're going to do that, and I agree with you, I think that's what the law says, what do we do with the fact that the district court had previously issued a written ruling on the motion in limine in which she clearly said that she would permit the witnesses to testify as to the circumstances surrounding the arrest, and then when trial counsel moved for sanctions against the city of West Covina's attorney, at the end of the case, the district court said, Look, I recognize that there was a misimpression, I forget the term she used, but essentially confusion, which I attribute to the district court in not making clear what counsel could elicit and what it could not elicit. Don't we have to consider that? Right. I understand what Your Honor is referring to. And the initial written response to the motion in limine was much more general, somewhat more vague. And I think that if you go back and look at the colloquy that took place, the oral colloquy right before that opening statement, that the court went back into that. And I think that what the court ultimately wound up saying as to that more general issue was that it would reserve, it wanted to reserve discretion to rule on that, whether that was actually going to turn out to be relevant with some of the issues, for example, of Mr. Gallagher's alcoholism and so on. And as the case evolved, Mr. Gallagher's counsel gave up certain claims, for example, lost wages and so on. And as he did that, some of these pieces of evidence that might have become relevant were not relevant anymore. But if I could focus the Court's attention, I think that the important thing here is that the ruling in question here was very, I think, very, very explicit. And particularly in light of counsel's, if you go back and you look at those 10, 15 pages, it's very clear two or three times counsel directly asks, may I say this? I want to say this on my opening statement. I want to refer to these threats. May I do it? And the Court said no with respect to that particular request. And again, in light of the inherently inflammatory nature of the allegations, hey, I've killed before, I'm going to kill my dad, I'm going to kill you. So in addition to that, Your Honor, I think the Lazar case is also interesting. Now, of course, we recognize it comes from a slightly different posture in the sense that the Ninth Circuit was affirming the District Court's granting of a mistrial as opposed to overturning a refusal to grant a mistrial. But we had a factual finding. That's the Ford Motor case, right? We had a factual finding that counsel for Ford Motor essentially deliberately disregarded the Court's instructions and willfully engaged in an attempt to salt the opening statement with information he knew. Here, don't we have a different case? I mean, you want to argue that it was crystal clear from the colloquy, but you want to downplay what the Court said in writing, in written order, and I'm trying to balance that against the Court's subsequent ruling on the motion for sanctions, that it wasn't willful. Right. Understood, Your Honor. A couple of things on that issue. First of all, I think if you go back and you look at the Ford case, as a matter of fact, the violation was much less clear. And, again, if I could focus the Court, the written motion of limine was much more general. It was much more general. It was directed more broadly at we don't want evidence of prior crimes, prior bad acts generally to come in. The ruling that we are specifically objecting to was very explicit. And I think if Your Honor goes back and, first of all, if I may say, the Court found when, or I don't know if you would say held, but the Court stated when it was discussing counsel's motion for a mistrial that she did not feel that her ruling was ambiguous. Moreover, Your Honor, I think if you go back and you read this 10, 15 pages and you look at this, with respect to this particular statement that we're objecting to, it's quite emphatic. Again, I'm repeating myself and I apologize, but. Well, I'm still wrestling, though, with what was wrong with the curative instruction. I mean, here we have a single reference in opening statements. The jury is immediately told that the arguments of counsel are not evidence and you don't consider them for that. And then we have two months of trial that follows. Don't we have to look? You're asking us to overturn a two-month jury trial on the basis of what, something that occurred in less than 10 seconds in the trial? Several responses, Your Honor. First of all, the two-month jury trial thing is a bit misleading. Okay. It was 18 trial days over a two-month period, but it's still a long trial. Moreover, Your Honor, I think what we need to look at is, the question is, was it more likely than not that the jury would have come out with a different verdict? I would submit to Your Honors, this statement's made, or very prejudicial allegations that are made during opening statements,  For example, if you imagine a hypothetical scenario where you're the plaintiff's attorney, you've got, you think that the evidence is pretty strong on your side, not a slam dunk, but pretty strong. And someone's, yes? I don't want to stop you from answering your question, but I wonder if you aren't overlooking something. What happened here when Mr. Gallagher was arrested? This isn't a situation where the police were driving by or doing other, they had been called. So the jury knew that the police came in the house, the man was laying on the couch, intoxicated, if we'd have believed the record, and he was arrested. So the jury had to know that the police had been called. And they weren't called because he was intoxicated. So there had to be a basis for the call. The jury could have had a question, but let's assume the answer had not come. They wouldn't have known why, what he had done, but they would have known that he had to do something because the police wouldn't have been called. Right. And we look at the record, we have to consider the full state of affairs, don't we? I understand, Your Honor, but in a way you've kind of put your finger on that there. The range of possible explanations for why he was arrested could range from something very minor to rape and multiple murder. So the fact in and of itself that he was arrested, of course, that wasn't even contested. The lawfulness of the arrest was not contested. So the jury was aware he was arrested. That was not an issue. But that doesn't mean that it was necessarily, or in fact it was not relevant for the jury to hear some of these pre-arrest threats, some of these very inflammatory statements. But is that relevant to the excessive force claim against the city? I mean, obviously, the amount of force that may be reasonable under the circumstances is going to vary depending upon whether you're making an arrest for trespass versus an arrest for assault with a deadly weapon. Right. I understand, Your Honor. I think, though, that if you take a look at the allegations, which are that Mr. Gallagher's ribs were broken and his pancreas was severed after he was arrested and subsequently. That's not what the jury found. Right. Again, referring to the. That's the only thing you slipped in there. Well, had the rulings been correct, the jury would have found otherwise. And again, certainly with respect to. The question in my mind is whether the trial judge should have excluded the evidence of why the officers were called to arrest. Assuming, but putting that aside, let's assume that we went along with you and said, I don't find any prejudice here by if we assume that this was an error, not to grant it. I mean, with respect to the excessive force claim, your client presented no evidence to corroborate his account of the arrest. Defense presented testimony from the arresting officers and a doctor that undermined your client's version of the event. So in any event, what what prejudice was shown? Well, first of all, Your Honor, I think if you go back and look at the totality of the evidence here, I understand that appellees have tried to portray this as a case in which all the evidence is on their side. But I think if you go back and you take a look, for example, when Mr. Gallagher did finally find a doctor in the prison system to take him seriously enough to examine him carefully, by Jove, he did have cracked ribs and a separate pancreas caused by blunt force trauma. Moreover, the appellee's theory was that, oh, well, he had been in a fight earlier that day. That must have been what it was. Well, then their own witness gets on the stand and backs away from that story. Oh, no, I mean, you know, somebody asked me with a friend who was who didn't like him, who asked me to, you know, tell the story so that she would have something on him and backed away. The point, if I may, is not that Mr. Gallagher would have won or who would have won. The point is, did Mr. Gallagher get a fair trial? And I think that this is a case, when you go back and you look at all the evidence, that could have gone either way. This was not a slam dunk either way. And given my interpretation, at least, which I would urge of Obrey, it is appellee's burden to show that more likely than not, there was no harm. Finally, if I could just, because I need to reserve some time here. I'm sorry to interrupt you, but is there any distinction between the defendants here, the city versus the county? I'm having a hard time seeing, even if there was prejudice that infected his claim against the city, how that is relevant at all to a claim of deliberate indifference on the part of the county to the medical care that he received several months later.  If you're a juror and I get up in front of you on opening statements and say, hey, this guy's a member of Al-Qaeda, he visits their websites, he hates his mother, he beats his wife, and you're sitting there on the jury, are you necessarily going to, you may well determine, you know what, first of all, I'm less likely to believe this guy. Second of all, even if I do believe him, I don't care, because he got what he had coming to him. Now, I don't think that the average juror is going to parse. To the treating physician, I mean, we're talking about a jail health care system. Everybody is in there because they did something, or at least they're accused of having done something. Right. So are you suggesting that an average juror would not be able to put out of his or her mind in evaluating whether there was deliberate indifference to his care? I don't see anything in the record where there's any indication that the treating physicians had any knowledge as to what this guy was in jail for. I mean, they're trying to, what the charge was, they're trying to decide whether or not he had an injury that they had to treat. Right. I think, Your Honor, the issue is how the jury is going to weigh the evidence, or is it going to weigh it at all. You can imagine the scenario, if I come out. Would a juror even think that that was relevant on that claim? That's where I'm having problems. If you look at the transcripts, Your Honor, I think, for example, you've got the Merrick Bob, I don't know if you recall that, but a very well-respected L.A. attorney who issued his semiannual reports, and this came in front of the jury. He was sort of watching out for them, and he was saying, this is appalling, this is abysmal. A reasonable jury could have come out either way. But it had nothing to do with why the person was in jail in the first place. That has to do, that's certainly relevant to whether or not the sheriff has adopted a let them eat cake philosophy with regard to medical care. Right, right. Understood. Your Honor, I would just submit that, and of course, this is somewhat subjective in terms of how prejudicial people will think certain types of statements and allegations are. But again, I think if you have a plaintiff with a couple of different defendants with some somewhat related claims, and you come out and you say such heinous things about this plaintiff, if it's going to upset the jury, if it's going to make the jury decide, I don't want to believe this guy, I think the average juror is not going to parse that, okay, well, I'll only think he's a rotten guy with respect to this claim and not with respect to the other defendants. And I guess I probably should. All right. Thank you. Thank you very much. Let's see, who's up? Mr. Lawrence, you want to be first? May it please the Court. Good morning, Your Honors. I'm representing the West Covina appellees here, and Mr. Stein is representing the County of Los Angeles appellees. We decided to split our time ten minutes each. What I will be addressing is the alleged error and its effect, and Mr. Stein will be addressing the Obrey case and issues related to that. The first thing I'd like to say is that if there was error in what happened, it was error that was prejudicial to the defense. I think Judge Nelson's question was right on point. Why would the Court exclude from evidence the very basis for the police officers being there? Graham versus Connor taught us a long time ago that in deciding whether force used by a police officer is unreasonable, you have to look at all the circumstances known to the officer at the time of the event. One of the things that they were told was that this plaintiff had threatened to kill his father, had threatened to kill Carmen Keniston, and in that context said he had stabbed before and would stab again. Now, in the prior written order on the motion, first of all, there was no motion in limine to exclude statements that were made at the time of the event. The motion in limine was to exclude the numerous prior convictions the plaintiff had, other bad acts, and the conviction that resulted from this incident, which was a conviction for making terrorist threats. The Court granted all of those motions. What I tried to clarify before we started to trial was the statement within a statement, and that is that he had told Ms. Keniston he had stabbed before, he would stab again. Now, that's what I was talking about because it was clear to me from the judge's prior order that witnesses were going to be allowed to testify about what occurred before the officers went there. One of the things that's relevant to is the officers entering the room where the plaintiff was with their guns drawn. If they were there simply because the plaintiff was drunk and his father and Ms. Keniston wanted him out of the house, the jury could find that going in there with guns drawn on Mr. Gallagher was excessive force because this Court has found previously, and I believe it's the Solano case, Robertson v. Solano County in 2002, that simply pointing a weapon at a person can be excessive force. So it was a surprise to me, and by the way, Plaintiff's Counsel, Mr. Yagman, did not raise this objection until the close of my opening statement, and if you look at the transcript, even Mr. Yagman was unclear as to the Court's ruling, and he's certainly not someone who minces words. If you go back and look at the transcript of the sidebar, he starts out by saying, I may be incorrect, but it's my recollection that the Court ordered that what Carmen, and then he goes on to talk about those statements, and then he concludes his statements with, on the other hand, if the Court didn't make that order, then I'm not correct. So even he was unsure that the Court's order was to preclude all of those statements, and frankly, I was shocked when Judge Marshall said that was her order. Was part of the problem, was it Ms. Kensington? Keniston. Keniston. She was going to testify as well to some other prior misconduct that he'd been involved in as part of the reason she feared him? Right. Why that got kind of all balled up here? Right, and Judge Marshall, in August, this trial started October, in August issued a written order addressing those issues, precluding the use of prior convictions, prior arrests, and even the conviction resulting from this case. So in my mind, that had all been resolved, and the only issue that remained was that statement within the statement. So you had to tell Keniston before you put her on the witness stand, you're not going to be allowed to say that one of the reasons that you feared that he meant what he said was that he bragged to you about having stabbed somebody previously? Exactly. Exactly. I mean, that's the issue. And what I said in my opening statement was that the plaintiff had threatened to kill Ms. Keniston and Mr. Gallagher, and none of the stab, I stab before, I'll stab again. And I was, frankly, very surprised when Judge Marshall found it the way she did. But this trial went on at length. There was abundant evidence in favor of the defense. I'm impressed with the court's knowledge of the facts of this case. The plaintiff claimed that he was hit with baseball-like strikes with a metal bar on his back and, of course, his torso. He was examined that night by a paramedic, no external injuries. He was examined later that night by a doctor at the hospital, no external manifestation of injuries. Examined at the county jail, no external manifestations of injuries. He was examined at L.A. County USC Medical Center, and the same was true. And the fact is that Trinidad Gallagher had previously stated, and I called her to testify, that the night before the incident, the late evening before the early morning of the incident, he came to her house, said he had been in a fight, looked like he had been in a fight, that he was intoxicated, and then later, or actually early morning of the next day, he went to his father's home, and that's where these events occurred. So I think it was very clear to the jury that the events that he described with the officer were fabricated, that the injury that he had was something that he acquired, I believe it was at the Food for Less parking lot where he would occasion to drink with friends, and there simply was not error here. And if there was, it was to my detriment because I said something in opening statement I could not prove up, and that's the last thing a trial attorney wants to do is make a representation to a jury and then not be able to prove it up during trial. If there are any questions, I'll be happy to answer them. Otherwise, I'll let Mr. Stein address you. All right, I think not. Thank you, Mr. Warren. Thank you. To please the Court, my name is Martin Stein, and I represent the county defendants, which include the County of Los Angeles, Sheriff Baca, and Dr. Nufusi. A procedural point I wanted to make that will take a moment regards Dr. Nufusi, who had the district court grant summary judgment on the deliberate indifference cause of action. Plaintiff later appealed the judgment, which included apparently the summary judgment, but in their opening brief make no argument as to the doctor as to why the summary judgment was incorrectly granted. We pointed that out in the joinder brief on his behalf. There's still no comment in the reply brief. So we had asked the Court to take that as a waiver and affirm the judgment as to Dr. Nufusi on the grounds that were stated in the summary judgment. With respect to the merits, I think the plaintiff originally got it right in his opening brief when he set forth what the standard of review was in misconduct case. And we, of course, agreed with that presentation and set forth that rule in our own appellee's brief, which is that the misconduct must be found to have so permeated the trial as to lead to the conclusion that the jury was necessarily influenced by passion and prejudice in reaching its verdict. When it comes to the question of showing on these misconduct cases, cases like Hemings, which is cited in our brief, make it very clear that it's the appellant's burden to establish prejudice. And the important fact here, if that is in fact the correct standard in misconduct cases, and we've cited numerous cases from pages 12 and 13 regarding the standard of review for attorney misconduct, assuming there was misconduct, plaintiff would have had the burden in his opening brief to set forth the evidence showing that this alleged misconduct had an impact on the jury's findings. But try as we may to go through that opening brief or even the reply brief, there is no account, complete account of the evidence on both sides to show that whatever misconduct was alleged, that it had an impact on the jury. I think even more important here, there's a piece of silence in this record which is ignored by the plaintiff in his reply. At one point in the reply brief, he mentions that the motion for new trial was denied. What was denied was the original motion for mistrial. There was a sanctions motion that was denied, but I think it's telling that plaintiff's attorney at trial, who was very well noted in the Southern California area for his expertise in trying civil rights cases, did not file a motion for new trial on the grounds of attorney misconduct. How on earth can a – can the court of appeal, this Court, be in a position to judge the misconduct issue when the trial judge wasn't given an appropriate opportunity by plaintiff's own action to judge whether or not there was a permeation of the misconduct through the course of trial? Now, we have a clue by – Well, it wouldn't have been until he made a sanctions motion. No, but what I'm saying – oh, I see. And did that come after the time for the filing of motions for a new trial had passed? I think it – my recollection, and I don't have the record in front of me, is that it occurred, I think, during the same time period that a motion could have been filed. I thought it was a written motion for sanctions, but my memory is absent. I was in trial counsel. I don't remember for sure when it occurred, but he wouldn't have known that, Your Honor, until there was a ruling on the sanctions motion. But if he wanted to make a record for a later appeal, if this was the big issue in the case, one would have to assume that since he made a motion for mistrial, he would know that if this is really serious error, now's the time to finish my record. Let's see what the trial judge is going to say. Here, we have these comments at the very beginning of trial, and then we have an 18-day trial, as the Court is aware, spreading over two months. And yet, with all the trial proceedings that go on, this is the only issue that is litigated. On the reply brief, Plaintiff's counsel raises for the first time the Opry case, which the Court, the panel that wrote that decision, made it clear that they were trying to clean up the dialogue, the difference of opinion between other divisions or other panels of this Court, regarding whether this kind of an error, or whether prejudice should be assumed, and therefore the party who is on the other side of the ruling, in this case the defendants, would have the burden of demonstrating that it was more probable or not that the error didn't cause prejudice. Opry was not a misconduct case. It was an evidentiary error case. It wasn't the first case. Indeed, I believe Judge Nelson wrote the Haddad case, I believe, in 1983 or 1985. Counsel surely could see the seeds of that argument in looking at Kaiser and Haddad, if they wanted to raise it, and yet we don't see this argument until the reply. The bottom line that we would say is they had the burden under the misconduct cases to show error and show it was prejudicial, but even if they didn't, because they didn't do their job in their briefs to demonstrate that this was a close case. Mr. Stanton, let me see if I understand your argument. On the assumption that Opry does apply and the burden then shifts to you to show that it's more probably than not untainted, is your argument then that the curative instruction by the district court cured whatever the taint may have been by Mr. Lawrence's inadvertent violation of the courts of pretrial order? A couple of answers, Your Honor. The first one is Opry, assuming that that standard set forth in the case is the standard for the entire Ninth Circuit, that standard only applies in close cases. And we say in our brief that this wasn't demonstrated to be a close case, so that the presumption that we have the burden of showing no prejudice. Opry doesn't quite say that, does it? I mean, as I read Opry, the problem was that Judge Reel excluded direct evidence of discrimination against Pacific Islanders that was the heart of the Title VII case by the fellow who was passed over for promotion at Pearl Harbor. So I don't know that you can distinguish Opry from the grounds that it was a close case. Well, there is language in Opry where it suggests the presumption is irrelevant when it's not a close case. I think that's what you're saying. Okay. So whatever the standard of error is or review for prejudice, we say that misconduct, there is a line of authority on misconduct cases saying the burden is always on the appellant. Even if that's not true, we say plaintiff in his opening brief didn't even recite the evidence going in each direction to show that it was a close case. So the burden shouldn't have passed to us in that situation. But even if it had, and we didn't know that Opry was going to come up, but we believe that in our appellee's brief, we demonstrated what the evidence actually was to show that it wasn't a close case, especially as this Court, as Your Honor has indicated, that the two defendants are in on the case on separate theories of liability. I don't believe that the jury – we have cases, I think, cited at page 19 of her brief that indicate that the courts will assume that the jury will, in fact, follow instructions by the district court. Here it didn't happen just once. The district court gave an instruction right after making its ruling on the motion for mistrial, and then at the conclusion of trial made another cautionary instruction to the jury. I don't know what other instruction she could have given, which would have not highlighted the situation even more to plaintiff's disadvantage. I think their argument is that no – that there was nothing that could be done other than – that the comment was so inflammatory that the only adequate solution was immediately declare a mistrial in a panel in New York. Well, I don't think it – all due respect to plaintiff's position, I don't believe it was so overwhelmingly prejudicial under the facts of this case and we don't believe it was misconduct at all. But even if Obrey applied, this isn't the case that it was meant to apply to. And there is no discussion in Obrey or Haddad, which was the earlier case, or Keiser that suggested it was to be applied in misconduct cases. If that were true, one, I would have to wonder then why do we have all that authority that comes after Haddad focusing on the misconduct cases with a different standard of review for the court. I don't think the standard of review has changed. If we look at the standard for the misconduct cases that we must look at – take into account all of the circumstances, we have several factors here that support affirmance of the judgment. We know that it was a brief isolated remark at the beginning of trial. The trial was 18 court days and two months ongoing without any other significant comments being made or suggestion of improper evidence or comment by counsel. We have the corrective instructions given twice. Case law saying we assume that they will be properly followed by the jury. We don't have any argument by plaintiff in his opening brief or even his reply citing cases where this kind of instruction was found to be an improper instruction. I believe it is a correct instruction of the law. And we also have evidence that we put forward in our appellee's brief that the medical care that Mr. Gallagher received did not rise to the level of deliberate indifference. They have not put anything in their briefs, opening or reply, to demonstrate evidence that with respect to the actual care that Mr. Gallagher got, that it was at such a high level of impropriety that the deliberate and standard – deliberate indifference standard could be said to apply. With respect to LASER, I think the Court – I think Your Honor made a comment that indicates that the Court is fully aware of the difference. There is a major procedural difference between the two cases. In LASER, the procedural fact is that the trial judge believed from the tenor of the comments and the tone that the attorney involved for Ford Motor Company had intentionally done something to violate the Court's order. And because of that, sanctioned the attorney at the beginning of the trial, granted a mistrial, and later entered monetary sanctions. So the appeal goes up on the sanction issue only, not on a jury determination. And the Court of Appeal under review said no abuse of discretion is shown under those circumstances, that the evidence supported what the trial judge did, and we find no abuse. This is just the opposite side of the coin. The trial judge, as the Court has noted, at the end of trial on the sanctioned issue said, I think there was a misunderstanding. She never says on the record or anywhere else that counsel for the city was guilty of misconduct at all. And so there's an evidentiary record to support that, and plaintiff cannot make an adequate argument that there's an abuse of discretion, and he doesn't argue abuse of discretion regarding the sanction order. Indeed, there's no appeal on the sanction ruling. We would submit it. All right. Thank you. Mr. Lawson, you have about three minutes. Thank you. Yes, I've talked myself into a bit of a corner here, so I'll just make a couple of observations with respect to what we just heard. First of all, I think it's worth pointing out with respect to the medical treatment and whether that met the standard or not that defendants are trying to have it both ways here. Their theory was that these were preexisting broken ribs and lacerations, and yet here they argue that, well, he came in and these people saw him and they didn't see any injuries. Well, to me, that speaks in favor of plaintiff rather than the converse. So, again, I think that that's worth noting. With respect to... I'm not sure I understand the point that you just made. How does that address... He clearly was injured, but if they didn't see the injuries, that doesn't help us decide the question of who delivered them. Right. Well, again, Your Honor, of course, we've got these two somewhat distinct theories going on. One is the delivery of the injuries, and the other is the adequacy of the treatment and why were his complaints ignored. And, indeed, a court order was... I'm still having a hard time seeing how the prejudice from the comment flowed over to the deliberate injury. Right. Well, I think, Your Honor, this goes to the argument that, oh, this wasn't even a close case. Why are we wasting our time here? It was not. This is a case that could have gone either way. Essentially, that's, I think, what that point goes to. What is your strongest argument that this is not a... that this is a close case? What kind of evidence was produced that makes this a close case? Well, I think, Your Honor, the fact that Mr. Gallagher's ribs were, in fact, found to be broken, that his pancreas was, in fact, lacerated, that it was lacerated by blunt force trauma, that Apelli's theory that, oh, this happened during a fight earlier was blown away by their own witness. Again, certainly... And, again, the question is not which way would we rule or what verdict would we issue if we were trying the case. The question is, is it a close enough case? Did Apelli's demonstrate that it's more likely than not that the jury would have come out the same way regardless? And, again, that's, I think, what this goes to is that this is not the slam-dunk case that Apelli's are attempting to portray it as. Well, as I searched the record, I really found no evidence to corroborate Mr. Gallagher's account of the arrest. And the defense presented testimony from the arresting officers and the doctor that clearly undermined his single version of the event. I mean, looking, as you suggested, at the totality of the circumstances, it doesn't appear to be a close case. You mentioned the injuries and that he clearly was injured. The fact they weren't discovered doesn't mean that they inflicted the injury. It meant that they weren't discovered no matter who inflicted the injury. I understand that. It certainly suggests at least that the medical care was not particularly up to snuff. Here's a guy with a severed pancreas and cracked ribs, and he's complaining for weeks and months about pain, and they don't even see it. But the standard is deliberate indifference. You've just described negligence. Well, again, Your Honor, I suppose that depends on how you look at it. Well, I think the Supreme Court has told us deliberate indifference means more than mere negligence. Right, right. Your Honor, I think also, Your Honor, if you look to the additional evidence that was submitted, for example, again, the Merrick Bobb reports that make it pretty clear that there is sort of a systemic problem here with the L.A. County's provision of medical services. That's not responsive to Judge Nelson's question. She's asking about evidence supporting his version of the arrest. Right. Well, first of all, you have extensive testimony by Mr. Gallagher himself. And then again, you have the fact that- That's all we have. Pardon? That's all we have. Of course, you also have the fact that the injuries had to come from somewhere. Yes, but we don't know where they came from. Right. Right. But again, absent the inflammatory and prejudicial comments that were made at the very beginning of the case before any evidence came in, we would submit that a reasonable jury could have found either way. And with the Court's indulgence, if I may, because I'm running out of time here- No, you are out of time. Out of time. Okay. Thank you very much. Thank you. I appreciate it. Mr. Lawson, and again, thank you for taking the case. Thank you. We very much appreciate that. Would the panel like a recess or- I'm fine. Let's take a ten-minute recess before we hear argument in the last case on the calendar. All rise. This court will stand for recess for five minutes and ten minutes.
judges: Farris, D.W. Nelson, Tallman